## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**SONYA ELLING,**                                      )          **Complaint for Declaratory and**
8412 Riverside Road                                    )          **Equitable Relief and Damages**
Alexandria, VA 22308                                   )
)
     **Plaintiff,**                             )          **Case No. _____**
)
     **v.**                                     )          **Jury Demand**
)
**ELI LILLY AND COMPANY,**                             )
Lilly Corporate Center,                                )
Indianapolis, IN 46285                                 )
)
**Serve:**                                             )
National Registered Agents Inc.                        )
1015 15th Street, N.W.                                  )
Suite 1000                                             )
Washington, D.C. 20005                                 )
)
     **Defendant.**                             )
_____)

## COMPLAINT AND JURY DEMAND

### Preliminary Statement

1.    Plaintiff Sonya Elling brings this action against her former employer, Eli Lilly and Company ("Lilly" or the "Company"), for declaratory relief and compensatory damages in the form of backpay, front pay, emotional distress damages, reputational damages, and attorneys' fees and costs, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*

2.    Beginning in 2017, when Lilly hired Leigh Ann Pusey as Plaintiff's second-level supervisor, Lilly discriminated against Plaintiff based on her sex—including her failure to

conform to traditional gender stereotypes, as a strong, assertive female, repeatedly made sexist remarks about Plaintiff inside and outside Lilly, undermined her authority in her larger professional community, subjected her to a sexually hostile work environment, and constructively discharged her.

3.     After Plaintiff reported and opposed Lilly's sex discrimination, including through her participation in an internal investigation of another Lilly employee's sex-discrimination complaint against Ms. Pusey, the Company retaliated against her based on her protected activity.

4.     In retaliation for Plaintiff's protected activity, and because of her sex, Lilly constructively discharged her.

## Jurisdiction and Venue

5.     Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiff's claims against Defendant arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.*, and present federal questions.

6.     Subject matter jurisdiction over Plaintiff's sex-discrimination and retaliation claims under the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, is proper in this Court pursuant to 28 U.S.C. § 1332(a), because: (a) Ms. Elling is a citizen of the Commonwealth of Virginia; (b) Defendant is a citizen of the State of Indiana, in which it is incorporated, and where it maintains its principal place of business; and (c) the amount in controversy exceeds $75,000.

7.     Subject matter jurisdiction over Plaintiff's DCHRA claim also is proper pursuant to 28 U.S.C. § 1367(a).

8.     Venue in this Court is proper under 42 U.S.C. § 2000e-5(f)(3), because, as described below, the unlawful employment practice was committed within the territorial bounds of the District of Columbia, and Plaintiff would have worked within the territorial bounds of the

2

District of Columbia, but for Defendant's illegal conduct.

9.      28 U.S.C. § 2201(a) authorizes this Court to grant declaratory relief.

**Parties**

10.      Ms. Elling is a citizen of the United States and currently resides at 8412 Riverside Road, Alexandria, Virginia 22308.  Lilly employed Ms. Elling from 2003 through December 1, 2019, when she worked at the Company's D.C. office, located at 555 Twelfth Street, N.W., Suite 650 South, Washington, D.C. 20004.

11.      Lilly is a domestic corporation, which is incorporated in Indiana, and has a principal place of business located at Lilly Corporate Center, Indianapolis, IN 46285.  Lilly manufactures pharmaceuticals, which it distributes across the world.

**Factual Allegations**

Ms. Elling's Employment History with Lilly.

12.      Ms. Elling is a highly accomplished and well-connected government affairs professional, with nearly twenty-five (25) years of experience in the field.

13.      In 2003, Lilly hired Ms. Elling as a Director on the Federal Government Affairs ("FGA") team.

14.      In 2005, Lilly promoted Ms. Elling to Senior Director.  In that capacity, Ms. Elling developed and executed legislative and advocacy efforts, coordinated political action committee activities, and managed critical relationships with members of Congress and Administration officials, with a focus over the past five (5) years, after Lilly expanded the department, on Republican members of Congress.

15.      Every year since her hire, during her nearly seventeen (17) years with Lilly, Ms. Elling earned "exemplary" or "satisfactory" performance ratings and qualified for annual merit-

based bonuses, raises, and stock awards.

16.     Lilly also recognized Ms. Elling with achievement awards, including an "Access Excellence Award" for "Speed Innovation," which it awarded to her on April 21, 2016, to recognize her "outstanding performance and achievement in 2015 for Project Indy," a cross-functional project aimed at promoting policies to reduce healthcare costs.

17.     Until the Fall of 2019, Ms. Elling's performance record was spotless, and no supervisor had ever expressed a concern about her performance.

<u>Leigh Ann Pusey's Discriminatory Animus Toward Ms. Elling.</u>

18.     Until the Summer/Fall of 2019, Ms. Elling was well-regarded as a "powerhouse" in the biopharmaceutical lobbying industry.

19.     On June 12, 2017, Leigh Ann Pusey became the Senior Vice President of Corporate Affairs, and Ms. Elling's second-line supervisor, with oversight over the entire FGA team.

20.     From the beginning of Ms. Pusey's tenure with Lilly, she regularly mocked and belittled Ms. Elling, another female employee ("Employee X"), and other female colleagues, both within the Company and to external stakeholders.

21.     For example, Ms. Pusey repeatedly referred to Ms. Elling, as well as to Employee X, as a "bitch."

22.     Ms. Pusey stated that Ms. Elling's age (then 49) precluded her from successfully engaging with members of Congress, because she was "not a cute, young thing," and thereby implied that Ms. Elling's past success was due solely to her physical appearance, and not to her skillset or qualifications.

23.     Ms. Pusey also mocked Ms. Elling for gaining weight during her recovery from

4

ACL surgery, and mocked the weight of several other female employees.

24. Ms. Pusey called Employee X "mean" and "nasty," mocked her tone of voice and speaking style, and told colleagues that she had "no reputation to protect," despite her excellent reputation in government affairs circles.

25. In addition, Ms. Pusey mocked the dress style of several other female employees, including Nancy Mann, Ms. Pusey's Indiana-based assistant, who has since retired.

26. Ms. Pusey did not engage in such conduct with respect to her male subordinates.

27. In fact, Ms. Pusey demonstrated a noticeable preference for male colleagues, and often flirted with them and referred to them in sexualized terms, such as "young buck."

28. Conversely, Ms. Pusey often ignored entirely Ms. Elling's and Employee X's presence in the office.

29. For example, on one occasion when Ms. Elling was in the office kitchen, Ms. Pusey walked in and warmly greeted Josh O'Hara, Assistant General Counsel, with "hey baby, how are you?, kissey kissey, haven't seen you in awhile!" When Ms. Elling attempted to greet Ms. Pusey, she curtly replied, "oh hi," and walked away.

30. Significantly, Ms. Pusey never told Ms. Elling or Employee X about any perceived deficiencies in their job performances. In fact, Ms. Pusey approved the 2017 and 2018 performance evaluations of Ms. Elling and Employee X—authored by Joseph Kelley, former Vice President of Global Government and International Corporate Affairs—which were both excellent, and their corresponding annual bonuses.

31. Mr. Kelley, as Ms. Elling's and Employee X's first-level supervisor, protected them from a great deal of Ms. Pusey's sex-based discrimination and retaliation until his retirement in March 2019.

Employee Y's Sex-Discrimination Complaint Against Ms. Pusey.

32.     On May 1, 2018, Ms. Pusey met with Employee Y, Director of Federal Advocacy and Alliance Development, and Employee X's direct report, during which Ms. Pusey made several sexist comments about Ms. Elling, Employee X, and other female colleagues.

33.     Employee Y reported these comments to Mr. Kelley on May 2, 2018, and then documented the conversation in an internal complaint filed on May 7, 2018.

34.     In her complaint, Employee Y stated, *inter alia*:

I have compiled this document in order to document a conversation between LLY Senior Vice President, Leigh Ann Pusey and myself. The conversation was **extremely** distressing to me. I genuinely believe that Pusey has created a hostile workplace environment, and that in many ways, she truly is a workplace bully. Frankly, I have concerns about my position, and because Pusey has shown limited competence in terms of exhibiting the Lilly values – Respect for People, Integrity and Excellence – I am genuinely concerned that she may take retaliatory action against myself or my team.

As I stated to HR previously, there were no witnesses to our discussion, and because Pusey outranks me by several level[s], I fear that my coming forward may result in my suffering repercussions of some kind. Even so, because I have been a Lilly employee for 16 years, and because I genuinely believe in Lilly, I have chosen to file this complaint.

Please know that I have **never** made this kind of claim against another employee. Although there have been multiple instances in which Pusey has genuinely made hurtful comments to me about others, the conversation I had with her on May 1 was so egregious, I am compelled to report her behavior.

Employee Y, Internal Complaint (May 2018) (emphasis in original).

35.     Employee Y then recounted her conversation with Ms. Pusey, during which Ms. Pusey made "a series of very negative and offensive comments about multiple staff members, including 2 senior directors and one VP."  *Id.*  The two senior directors were Ms. Elling and Employee X.

36.     Among other negative remarks about the two women, Ms. Pusey mocked

Employee X's vocal tone and speaking style, and stated that Ms. Elling and Employee X were "nasty" and "mean." *Id.*

37.     According to Employee Y's complaint, Ms. Pusey then said that Ms. Elling "needed to go" and that "she is a bitch." Ms. Pusey pressed Employee Y, "You think Elling is a bitch, right?" *Id.*

38.     Because Employee Y was stunned that Ms. Pusey would ask such a question, and began to feel threatened, given Ms. Pusey's significant seniority over Employee Y, she attempted to deflect the question.

39.     However, Ms. Pusey interjected and insisted that Employee Y respond to her question about whether Employee Y agreed that Ms. Elling was "a bitch."

40.     At the close of her complaint, Employee Y stated that "Ms. Pusey's undermining [of Ms. Elling's government affairs team] around town keeps coming back to our team," and that, "in a town in which reputation is the only currency we maintain, her actions represent blatant and frank undermining of Lilly's business goals." *Id.*

41.     Employee Y continued:

> Her slanderous comments and the outright lies she has told to high-level influencers – many of which **we** have introduced her to – put the business, Lilly's reputation and frankly Dave Ricks [sic] credibility into question for anyone in DC who has heard her vitriol.
>
> There can be no path forward – she cannot lead this office and frankly is not competent to do so. She has burned too many bridges and as long as she is part of this company, we cannot get those back.

*Id.* (emphasis in original).

42.     After Employee Y submitted her internal complaint, Raymond Muller, Senior Director of Human Resources Workforce Services, initiated an investigation into the allegations against Ms. Pusey.

43.     Mr. Muller conducted his investigation between May and June 2018, during which he interviewed Ms. Elling and Employee X on May 14, 2018, as well as other members of the FGA team.

44.     During Mr. Muller's interview with Ms. Elling, she reported that Ms. Pusey treated female colleagues—particularly strong, confident women such as herself and Employee X, who did not conform to certain gender stereotypes—worse than male colleagues.

45.     Ms. Elling further reported that Ms. Pusey frequently engaged in flirtatious banter with male colleagues, but severely limited her social interactions with female colleagues.

46.     In addition, Mr. Muller asked Ms. Elling whether she believed that Ms. Pusey "holds women to a different, higher standard," and Ms. Elling replied, "yes."

47.     During Employee X's interview, she also corroborated many of Employee Y's allegations regarding Ms. Pusey's creation of a sexually hostile work environment.

48.     Additionally, on information and belief, Mr. Kelley confirmed during his interview with Mr. Muller that Ms. Pusey treated Ms. Elling and Employee X differently than their male colleague, and held them to higher standards.

49.     Less than one month later, on June 6, 2018, as Ms. Elling was walking down the hallway toward her office—which was located directly next to Ms. Pusey's office—she overheard Ms. Pusey conversing with Cheryl Salehi, a Senior Executive Assistant.

50.     Ms. Pusey stated to Ms. Salehi, "they are both bitches and need to realize that I am the boss."

51.     Ms. Elling then turned the corner, and, upon seeing Ms. Elling, Ms. Pusey and Ms. Salehi froze and immediately stopped speaking.

52.     On information and belief, Ms. Pusey was referring to Ms. Elling and Employee

X when she stated that "they are both bitches."

53.     On June 13, 2018, Mr. Muller emailed Employee Y to notify her of the conclusion of his investigation, and stated, "[t]here was merit in your concern and on behalf of the company I would like to acknowledge that."

54.     Mr. Muller's statement demonstrated that his investigation had substantiated the allegations against Ms. Pusey.

55.     Mr. Muller further promised that an "action plan will be put in place by Leigh Ann[ ] and I will ask you to find a constructive way to work with her as she puts this corrective action plan in place," and stated that he could "only assume that she [Ms. Pusey] has taken the matter to heart."

56.     On June 28, 2018, Ms. Pusey met with Ms. Elling and Employee X, along with other members of the FGA team, and purported to apologize for her behavior.

57.     On information and belief, upper management forced her to do so.

58.     However, Ms. Pusey's apologies were not sincere, and she instead lied and blamed other individuals for the discriminatory conversations in which she had engaged.

59.     Specifically, she apologized only for "participating in conversations initiated by others," when, in fact, she had initiated the conversation at issue with Employee Y, as well as other conversations with external parties in the government affairs industry.

60.     A short time later, in or around late June 2018, Mr. Kelley called Mr. Muller to notify him that, rather than make a good faith effort to apologize, Ms. Pusey had instead lied to her colleagues and blamed others for her inappropriate behavior.

61.     During this telephone call, Mr. Muller admitted to Mr. Kelley that Ms. Pusey "was caught lying numerous times" during the internal investigation.

<u>Ms. Pusey Retaliated, and Continued to Discriminate, Against Ms. Elling.</u>

62.     From the Summer of 2018 through early 2019, Ms. Pusey retaliated against Ms. Elling and Employee X for their reports to Mr. Muller about her sex discrimination.

63.     Starting in late 2018, Ms. Pusey began to exclude Ms. Elling and Employee X from important working groups, projects, and communications, which were part of their job responsibilities.

64.     For example, on January 17, 2019, Ms. Pusey excluded Ms. Elling's team from Lilly's annual Corporate Affairs planning meeting, the purpose of which is to establish Lilly's strategies for federal policy issues, which is the FGA team's main function.

65.     Although Lilly falsely claimed that Ms. Pusey did not include any other Senior Director or Senior Advisor employees in this meeting, at least nine Senior Director-level employees attended the meeting.

66.     Ms. Pusey also cut Ms. Elling out of communications about the FGA team's quarterly updates to Lilly's new CFO, Josh Smiley, even though, as Senior Director of FGA, Ms. Elling had always been responsible for presenting the updates to Lilly's former CFO, Derica Rice.

67.     In late 2018 to early 2019, Ms. Pusey further cut Ms. Elling and Employee X out of important briefings to prepare Dave Ricks, Lilly's CEO, for Pharmaceutical Research and Manufacturers of America ("PhRMA") Board meetings—briefings in which they had always previously participated.

68.     Throughout 2019, Ms. Pusey refused to let Employee X brief Lilly executives on Lilly's AMP cap negotiation—its top federal priority at the time—despite the fact that her job responsibilities included serving as Lilly's point person in those negotiations and briefing Lilly

executives about them.

69.     Ms. Pusey's refusal to include Ms. Elling and Employee X in these discussions led to considerable frustration on the part of senior staff, who worried that Mr. Ricks and other senior executives were not being updated appropriately with the political intelligence gathered by Lilly's FGA team, and would therefore be unable to accurately respond to questions on these subjects.

70.     Ms. Pusey further excluded Ms. Elling and Employee X from communications, including communications necessary to perform their jobs, and generally refused to engage with them in the office.

71.     Specifically, Ms. Pusey excluded Ms. Elling and Employee X from meetings and communications intended to keep participants updated on Lilly's federal affairs priorities, for which both were responsible.

72.     Ms. Pusey similarly isolated Employee Y.

73.     Ms. Pusey did not similarly isolate male employees, reduce their job responsibilities, or exclude them from important meetings.

74.     Nonetheless, from 2017 through early 2019, Ms. Elling and Employee X continued to maintain a good working relationship with their direct supervisor, Mr. Kelley.  Mr. Kelley consistently gave them positive feedback on their work performance and, on information and belief, shielded them from the more severe discriminatory and retaliatory actions that Ms. Pusey desired to take against them.

75.     During this time, Ms. Pusey discussed the investigation against her with numerous third parties, several of whom asked Employee X about her involvement, which made clear that Ms. Pusey had knowledge of Employee X's participation in the investigation.

76.     On October 30, 2018, Rick Bahr, Human Resources Director, met with Ms. Elling, Employee X, and other members of the FGA team individually, purportedly to investigate whether Ms. Pusey's behavior had changed following Mr. Muller's investigation.

77.     During his meeting with Ms. Elling, Mr. Bahr referred to Ms. Pusey's disparate treatment of her and Employee X as a "cat fight"—an obviously sexist term that disregarded Ms. Pusey's discriminatory and retaliatory behavior.

78.     Since Mr. Bahr was failing to investigate or take action on her reports of gender discrimination, later that day, Ms. Elling reported the "cat fight" comment to Employee X, Jesse Price, Senior Director for Government Affairs, and Tracy Simon, Senior Federal Affairs Specialist.

79.     The following day, October 31, 2018, Ms. Elling approached Mr. Bahr to tell him directly that his "cat fight" comment was sexist and demeaning to women.  In response, Mr. Bahr admitted that he should not have made the comment, and then quickly changed the subject.

Shawn O'Neail's Discrimination and Retaliation Against Ms. Elling.

80.     On March 29, 2019, Mr. Kelley retired.

81.     Following his retirement, Ms. Pusey escalated her retaliatory behavior against Ms. Elling and Employee X, as Mr. Kelley could no longer protect them as their supervisor.

82.     Subsequently, in May 2019, Ms. Pusey hired Shawn O'Neail to replace Mr. Kelley as Vice President for Federal and State Government Affairs.  In this role, Mr. O'Neail reported directly to Ms. Pusey.

83.     On information and belief, Ms. Pusey hired Mr. O'Neail to get rid of Ms. Elling and Employee X, both of whom he directly supervised.

84.     In fact, Mr. O'Neail openly stated that he was "hired to clean house" at Lilly.

12

85. Mr. O'Neail has a history of, and reputation in the industry for, engaging in misogynistic, as well as racist,[1] behavior.

86. Numerous former colleagues of Mr. O'Neail's have stated that he discriminates against women, particularly those who are assertive, and that he treats male employees preferentially.

87. For example, in his prior position at the Novartis Corporation ("Novartis"), Mr. O'Neail openly favored a male direct report, Taylor Booth, to the point where Mr. O'Neail's supervisor, Dan Casserly, ordered him to discontinue this obvious favoritism.

88. Mr. O'Neail also heavily scrutinized sick leave taken by female staff members at Novartis, but did not do the same with male staff.

89. Mr. O'Neail also engaged in other grossly unprofessional behavior at Novartis, which made its female staff highly uncomfortable.

90. For example, on one occasion in or around the Spring of 2019, Mr. O'Neail arrived to Novartis' D.C. office intoxicated and proceeded to change his clothes—before attending a baseball game—in an all-glass conference room, in full view of female staff members.

91. After hiring Mr. O'Neail, Ms. Pusey met one-on-one with each FGA lobbyist, including Ms. Elling and Employee X, on May 2, 2019.

92. During her meeting with Ms. Elling, she stated, "I really hope it won't be a problem for you that he [Mr. O'Neail] is a Democrat."

---

[1] Mr. O'Neail has reportedly referred to African Americans as "n*****s" during conversations with other professionals in the healthcare government relations space.  As one example, in reference to Angela Riemer, Senior Director for Federal Government Relations at Pfizer, who is African American, Mr. O'Neail stated to Ms. Riemer's white, male colleague, "those n*****s are all the same and so lazy."

93.    Ms. Elling replied, "why would it be a problem? That makes no sense."

94.    Ms. Elling then explained that Lilly had hired her specifically for her capacity to lobby both Democrats and Republicans, and that she had reported directly to a Democrat—John Bonitt, former Vice President of FGA—from August 2004 until his retirement in December 2014, and maintained an excellent working relationship with him.

95.    Ms. Pusey replied, "well, I know how you girls can be."  Ms. Elling did not respond to her sexist comment.

96.    During her meeting with Employee X the same day, Ms. Pusey again suggested that Ms. Elling and Employee X might have trouble reporting to Mr. O'Neail because he is a Democrat, and they are Republicans.

97.    Employee X replied that Mr. O'Neail's political affiliation was not a concern, that one of her best former supervisors and mentors while she worked at PhRMA, Bob Filippone (now Vice President of Global Public Policy for Merck & Co.), was a Democrat, and that she would do everything she could to help Mr. O'Neail and the FGA team succeed.

98.    Ms. Pusey's comments during these conversations were discriminatory, and suggested that Republican women, in particular, Ms. Elling and Employee X, were incapable of working with a Democratic man.

99.    On May 14, 2019, Ms. Elling and Employee X attended their first one-on-one (or "check-in") meetings with Mr. O'Neail, the alleged purpose of which was for supervisors to provide performance feedback and goals to employees.

100.   Mr. O'Neail did not provide performance feedback and goals to Ms. Elling or Employee X, during the May 14, 2019 check-in meeting or any of his subsequent check-in meetings with Ms. Elling (held on June 18, September 10, October 9, and October 23, 2019) and

Employee X (held on May 14, June 11, and June 21, 2019).

101.    Rather, he used the meetings to gather as much political intelligence from them as possible before he and Ms. Pusey fired them.

102.    Beginning in the early Summer of 2019, Mr. O'Neail began making sexually aggressive gestures toward Employee X during his one-on-one meetings with her.

103.    Specifically, during their one-on-one meetings, Mr. O'Neail placed his crotch at Employee X's eye level and repeatedly grabbed himself.

104.    Mr. O'Neail continued to grab his crotch in front of Employee X during their one-on-one meetings until Lilly's eventual termination of her.

105.    Similarly, Ms. Elling was forced to witness inappropriate sexual self-groping by Mr. O'Neail during interactions with him in her office, at her eye level and in violation of her personal space.

106.    Further, in or around June 2019, Mr. O'Neail told Scott Olsen, Head of Federal Advocacy at PhRMA, about the 2018 investigation into Ms. Pusey.

107.    Upon information and belief, Mr. O'Neail also told Mr. Olsen that he was hired to "clean house" because the FGA team had problems.

108.    Mr. Olsen then told his entire team at PhRMA that Lilly's FGA team had "Human Resources problems."

109.    Subsequently, inaccurate rumors circulated amongst industry members in D.C. that Lilly's FGA team had serious performance issues, which damaged Ms. Elling's and Employee X's reputations within the lobbying community.

  Employee X's Pretextual Performance Improvement Plan and Termination.

110.    On July 22, 2019, Mr. O'Neail abruptly placed Employee X on a Performance

Improvement Plan (a "PIP"), and simultaneously issued her a "Written Warning," which was the first formal discipline that she had ever received over the course of her professional career.

111.    Mr. O'Neail never previously mentioned any performance issues with Employee X during their check-in meetings on May 14, June 11, and June 21, 2019.

112.    The PIP contained baseless and sexist criticisms of Employee X's performance, none of which constituted misconduct, and each of which is demonstrably false.

113.    Among other examples, the PIP accused Employee X of being late to a staff meeting on a date on which no staff meeting was held.

114.    The PIP also penalized Employee X for attending a conference to promote female leadership, even though Mr. O'Neail had pre-approved Employee X's attendance and associated expenses.

115.    The PIP also contained several petty—and fabricated—slights, including Mr. O'Neail's claim that Employee X once interrupted him at a meeting, and once expressed (valid) concerns about a proposed timeline.

116.    Mr. O'Neail also falsely accused Employee X of "withholding" timely intelligence, something she would never do.  In fact, when Employee X asked Mr. O'Neail to substantiate the allegation, he could not do so.

117.    At the time he placed her on a PIP, Mr. O'Neail had only been supervising Employee X for fifty days, six of which the Company was closed, and eight of which Mr. O'Neail was either on vacation or traveling.

118.    Accordingly, Mr. O'Neail placed Employee X on a PIP after only one month of actual supervision.

119.    During that period, he met with her a total of five times—during two team

meetings and three one-on-one meetings.  In none of those meetings did Mr. O'Neail identify any problems with her performance or engage in any sort of coaching.

120.    On information and belief, Ms. Pusey and Mr. O'Neail worked in concert to issue the fabricated PIP to Employee X.

121.    On July 26, 2019, Mr. O'Neail conducted Ms. Elling's midyear performance review.

122.    During the review, Mr. O'Neail did not mention any performance issues.  Nor did he offer any coaching or guidance on his expectations as Ms. Elling's new supervisor.

123.    Rather, he stated that, because he had only been supervising Ms. Elling for a short time, he was unable to set goals for her performance.

124.    This statement directly contradicted Mr. O'Neail's claims of Employee X's performance deficiencies, since he was, admittedly, not capable of finding problems with her performance after only one month of supervising her.

125.    Despite the baseless and pretextual nature of Employee X's PIP, between July and September 2019, she worked diligently to meet and exceed all performance goals set for her in the PIP.

126.    During this time, Mr. O'Neail never mentioned any performance issues in their one-on-one meetings.

127.    Nonetheless, on September 30, 2019, Mr. O'Neail scheduled a meeting with Employee X and Laura Lemons, a Human Resources consultant, during which he notified Employee X that she was being placed on "Probation."

128.    During the meeting, Ms. Lemons asked Employee X if she were "happy" working at Lilly, in a blatant attempt to convince her to leave the Company.

129.     Ms. Lemons further told Employee X, "Let me know if you ever want to be done with this," i.e., done with the PIP and separated from Lilly.

130.     Similar to the PIP, the Notice of Probation contained numerous false criticisms of Employee X's performance.

131.     For example, the Notice of Probation falsely accused Employee X of being "late to our staff meeting on 9/16/19 while standing in the hall outside the meeting talking to another individual without consideration for those who were waiting on you to start the meeting."

132.     In fact, no Federal Affairs staff meeting was held on September 16, 2019, and when staff meetings were held, Employee X usually was the first or second person to arrive.

133.     On October 15, 2019, Employee X submitted a detailed written response to the PIP and Notice of Probation, on which she copied Mr. O'Neail, Michael Harrington, General Counsel, and Stephen Fry, Senior Vice President of Human Resources & Diversity.

134.     In her response, she demonstrated the false and defamatory nature of each of the allegations set forth in the PIP and Notice of Probation, and she reiterated that Ms. Pusey had repeatedly discriminated against her and Ms. Elling on the basis of their sex, and retaliated against the two of them for participating in the investigation of Employee Y's gender-discrimination complaint.

135.     Lilly subsequently launched a purported "investigation" into the allegations set forth in Employee X's written response.

136.     However, Ms. Lemons, who conducted the investigation, told Employee X she "could not guarantee" a fair investigation.  In fact, Lilly's Human Resources investigation lasted only four days, and Ms. Lemons never contacted Ms. Elling, despite the clear reference to her in Employee X's response.

18

137.     Ms. Lemons did, however, contact Mr. Price and Employee Y, both of whom confirmed that Ms. Pusey had engaged in a pattern of discrimination against female employees—in particular, Ms. Elling and Employee X—and held them to higher standards than their male counterparts.[2]

138.     On October 28, 2019, Ms. Lemons falsely told Employee X that Lilly's investigation into her allegations had resulted in "no evidence of discrimination," even though at least two witnesses corroborated the gender discrimination.

139.     Lilly took no corrective action, but instead executed Ms. Pusey's and Mr. O'Neail's plan to terminate Employee X.

140.     The following day, October 29, 2019, Mr. O'Neail and Ms. Lemons met with Employee X and notified her that she was being terminated, effective immediately, purportedly for "failing to meet" Mr. O'Neail's expectations following his issuance of the PIP.

141.     In fact, she had clearly satisfied all goals established in the PIP and Notice of Probation, despite their pretextual nature.

<u>Ms. Elling's Pretextual Performance Improvement Plan and Constructive Discharge.</u>

142.     On October 23, 2019, Mr. O'Neail met with Ms. Elling for a check-in meeting. As with the other meetings, he focused solely on Ms. Elling's political intel, and did not raise any concerns about her job performance.

143.     On October 29, 2019, the date of Employee X's termination, Jason Finkenkeller, another Human Resources consultant, scheduled a meeting with Ms. Elling and Mr. O'Neail for

---

[2] Ms. Pusey and Mr. O'Neail also retaliated against Mr. Price for his reports of Ms. Pusey's discriminatory and retaliatory behavior, by, *inter alia*, removing his most significant job responsibility, and his only managerial role, the management of the LillyPAC, and constructively discharging him in August 2020.

the following day, October 30, 2019.

144.    During the October 30 meeting, Mr. O'Neail falsely accused Ms. Elling of

making disparaging statements about Lilly to Congressional staff, and of engaging in "distracting

behaviors" during meetings, for which he stated Lilly would discipline her.

145.    Never before had Mr. O'Neail mentioned any alleged issues with Ms. Elling's

performance.

146.    In response, Ms. Elling stated that these allegations were false, and that she had

never made any disparaging statements.

147.    During the meeting, Mr. Finkenkeller also asked Ms. Elling whether she was

"happy working here," the same terminology that Ms. Lemons used with Employee X.

148.    Ms. Elling replied that she had been dedicated to Lilly for over sixteen (16) years,

worked tirelessly on behalf of the Company, and was proud of her work.

149.    On November 12, 2019, Mr. O'Neail and Mr. Finkenkeller scheduled another

meeting with Ms. Elling, during which they issued her a written PIP.

150.    Similar to Employee X's PIP, Ms. Elling's was riddled with misrepresentations,

as well as negative stereotypes of women.

151.    For example, Lilly falsely accused Ms. Elling of "exposing" financial data to a

Senior Advisor in Government Strategy.

152.    In fact, on September 23, 2019, Mr. O'Neail provided Ms. Elling with the

financial data in question and stated, "[c]an use in your outreach per our discussion at staff."

153.    Pursuant to Mr. O'Neail's express instructions, Ms. Elling provided the data to

Congressional staff members, but the data was never disclosed in Congressional hearings or

otherwise made public.

154.    Yet, on September 25, 2019, Mr. O'Neail falsely claimed that he had never authorized Ms. Elling to disclose the data for use in a Congressional hearing, and thereby implied that she had disclosed information during a hearing in violation of his instructions.

155.    In response, Ms. Elling explained that Mr. O'Neail's instruction did not distinguish between disclosing the data in a private versus a public setting.  Regardless, she stated that the data had not been disclosed at a Congressional hearing or publicly, as he falsely claimed.

156.    Mr. Price, who was also copied on the email, stated that, per Mr. O'Neail's guidance, he, too, had shared the data externally.

157.    Mr. O'Neail then replied, in part: "Referencing in a hearing/publicly was the distinction. ***I had not made clear in the mssg [message] below the distinction***." (emphasis added).  Mr. O'Neail's statement underscored the falsity of his accusation against Ms. Elling.

158.    The PIP also accused Ms. Elling of being "disruptive," "rude," and "aggressive," which are common stereotypes attributed to strong, female leaders.

159.    Given Mr. O'Neail's and Ms. Pusey's persistent discrimination and retaliation against Ms. Elling, it was clear that they were using the PIP to drive her from the workplace, and that they would terminate her at the conclusion of her PIP, just as they had done with Employee X.

160.    Mr. O'Neail's veiled threat to fire her—i.e., issuing her a written PIP replete with false allegations and, through Human Resources, asking whether she was happy working at Lilly, the same pattern of conduct in which he engaged before terminating Employee X—forced Ms. Elling to resign, because it made clear that she had no prospect of future employment or advancement at Lilly.

161.     On December 1, 2019, Ms. Elling sent a resignation email to Mr. Fry and Mr. Harrington, with Mr. O'Neail copied, which explained that she was forced to resign due to Ms. Pusey's and Mr. O'Neail's discrimination and retaliation against her.

162.     In or around mid-January 2020, Lilly hired a new Senior Advisor on the FGA team, TC Roberge, who is a male.

163.     On information and belief, Mr. Roberge was hired to replace Ms. Elling.

Plaintiff's Damages and Mitigation Efforts.

164.     After Ms. Elling's constructive discharge, she began a new position as a Senior Director at a biotechnology company.

165.     However, in Ms. Elling's new position, she earns an annual salary that is considerably less than the salary she earned at Lilly.

166.     In addition, as a result of Lilly's sex discrimination and retaliation, Ms. Elling lost income in the form of considerable benefits, annual performance bonuses and incentives, and shares of stock issued but not yet vested.

167.     Further, Ms. Elling has suffered, and continues to suffer, severe emotional distress as a result of Lilly's sex discrimination and retaliation.

168.     Lilly's discriminatory and retaliatory treatment of Ms. Elling has caused her to suffer from migraine headaches, insomnia, self-doubt, and severe anxiety.

169.     In fact, during a doctor's appointment in November 2019, Ms. Elling's primary care provider told her that her blood pressure was higher than it had ever been, and attributed her abnormally high blood pressure to her stressful work environment.

170.     Ms. Elling's primary care provider provided her a prescription to treat her anxiety.

171.     Ms. Elling's anxiety has been further aggravated by Lilly's continued damage to

her professional reputation—damage that is irreparable.

172.    Historically, Ms. Elling had an excellent reputation in the pharmaceutical field, on which she prided herself and built her successful career.

173.    However, Ms. Pusey's and Mr. O'Neail's disparaging statements about Ms. Elling to external stakeholders and other Lilly employees has permanently damaged her once-spotless reputation.

174.    This reputational damage is particularly significant in an industry that places a premium upon reputations and connections, such as government affairs.

<u>Additional Sex-Discrimination Complaints Against Ms. Pusey.</u>

175.    In or around late November 2019, Kelly Murphy, then-Senior Director of Corporate Communications, and Amy Sousa, then-Senior Director of Employee Communications, filed gender-based hostile work environment complaints against Ms. Pusey, their first-level supervisor.

176.    On information and belief, both Ms. Murphy and Ms. Sousa reported that Ms. Pusey had engaged in a pattern of discriminating against female employees.

177.    In addition, in December 2019, Employee Y resigned from Lilly.

178.    Shortly thereafter, in or around early January 2020, both Ms. Murphy and Ms. Sousa resigned, and cited Ms. Pusey's disparate treatment of them as women as the reason for their resignations.

179.    Additionally, on February 11, 2020, Catherine Hinckley resigned from her position as Senior Director of International Government Affairs, in which capacity she reported directly to Ms. Pusey.

180.    On information and belief, Ms. Hinckley resigned, at least in part, due to Ms.

Pusey's sexually discriminatory behavior toward her.

<u>Plaintiff Exhausted Her Administrative Remedies.</u>

181.     On January 28, 2020, Ms. Elling filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), in which she alleged that Lilly subjected her to sex discrimination, a sexually hostile work environment, and retaliation on the basis of her protected activity.

182.     On December 28, 2020, the EEOC issued Ms. Elling a right-to-sue letter, which made no finding with respect to the merits of her claims.

183.     42 U.S.C. § 2000e-5(f)(1) authorizes Ms. Elling to bring an action against Lilly in federal district court.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2, AGAINST DEFENDANT ELI LILLY AND COMPANY

184.     Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 183 above, as though restated herein.

185.     Title VII prohibits an employer from discriminating against an employee on the basis of gender, including her failure to conform to traditional gender stereotypes.

186.     Plaintiff is female.

187.     Plaintiff's first- and second-level supervisors, Mr. O'Neail and Ms. Pusey, discriminated against Plaintiff on the basis her sex by subjecting her to disparate treatment vis-à-vis her male counterparts, by, *inter alia*, (1) making sexist comments about her, including by calling her "mean," "nasty," "disruptive," "rude," "aggressive," and a "bitch," because she is a strong, assertive female; (2) mocking her physical appearance; (3) attributing her professional success solely to her physical appearance, despite her outstanding credentials and job

performance; (4) excluding her from meetings, including the Corporate Affairs Planning

Meeting, the quarterly updates to Lilly's CFO, and the briefings for the PhRMA Board meetings,

which inhibited her ability to perform her job because she was isolated from communications

about Lilly's federal affairs strategies and priorities, for which she was responsible; (5) holding

her to higher standards than her male counterparts; (6) undermining her and disparaging her

professional reputation both internally and externally, which further inhibited her ability to

perform her job; (7) ignoring her presence in the office; (8) fabricating pretextual reasons to

place her on a PIP; and (9) constructively discharging her.

188.    Ms. Pusey and Mr. O'Neail's purported reasons for placing Plaintiff on a PIP and

pushing her out of the Company—that she exhibited certain performance deficiencies—are

demonstrably false, as evidenced by the fact that neither Ms. Pusey nor Mr. O'Neail ever

mentioned any performance deficiencies, including during Plaintiff's check-in meetings and

midyear performance evaluation.

189.    Plaintiff's sex, including her failure to conform to gender stereotypes, caused Ms.

Pusey and Mr. O'Neail's hostility toward Plaintiff, Lilly's disparate treatment of Plaintiff vis-à-

vis her similarly situated male colleagues, and Lilly's constructive discharge of Plaintiff.

190.    As a result of Lilly's discriminatory treatment and constructive discharge of

Plaintiff, she has suffered, and will continue to suffer, past and future economic losses, lost

benefits, damage to her professional reputation, emotional distress, and pain and suffering.

**COUNT II**
**SEX DISCRIMINATION IN VIOLATION OF THE DISTRICT OF COLUMBIA**
**HUMAN RIGHTS ACT, D.C. CODE § 2-1402.11,**
**AGAINST DEFENDANT ELI LILLY AND COMPANY**

191.    Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1

to 190 above, as though restated herein.

192.    The DCHRA prohibits an employer from discriminating against an employee on the basis of gender, including her failure to conform to traditional gender stereotypes.

193.    Plaintiff is female.

194.    Plaintiff's first- and second-level supervisors, Mr. O'Neail and Ms. Pusey, discriminated against Plaintiff on the basis her sex by subjecting her to disparate treatment vis-à-vis her male counterparts, by, *inter alia*, (1) making sexist comments about her, including by calling her "mean," "nasty," "disruptive," "rude," "aggressive," and a "bitch," because she is a strong, assertive female; (2) mocking her physical appearance; (3) attributing her professional success solely to her physical appearance, despite her outstanding credentials and job performance; (4) excluding her from meetings, including the Corporate Affairs Planning Meeting, the quarterly updates to Lilly's CFO, and the briefings for the PhRMA Board meetings, which inhibited her ability to perform her job because she was isolated from communications about Lilly's federal affairs strategies and priorities, for which she was responsible; (5) holding her to higher standards than her male counterparts; (6) undermining her and disparaging her professional reputation both internally and externally, which further inhibited her ability to perform her job; (7) ignoring her presence in the office; (8) fabricating pretextual reasons to place her on a PIP; and (9) constructively discharging her.

195.    Ms. Pusey and Mr. O'Neail's purported reasons for placing Plaintiff on a PIP and pushing her out of the Company—that she exhibited certain performance deficiencies—are demonstrably false, as evidenced by the fact that neither Ms. Pusey nor Mr. O'Neail ever mentioned any performance deficiencies, including during Plaintiff's check-in meetings and midyear performance evaluation.

196.    Plaintiff's sex, including her failure to conform to gender stereotypes, wholly or

partially motivated Ms. Pusey and Mr. O'Neail's hostility toward Plaintiff, Lilly's disparate treatment of Plaintiff vis-à-vis her similarly situated male colleagues, and Lilly's constructive discharge of Plaintiff.

197.    As a result of Lilly's discriminatory treatment and constructive discharge of Plaintiff, she has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

**COUNT III**
**RETALIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3(a),**
**AGAINST DEFENDANT ELI LILLY AND COMPANY**

198.    Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 197 above, as though restated herein.

199.    Title VII prohibits an employer from retaliating against an employee for engaging in protected activity under Title VII.

200.    Plaintiff engaged in protected activity under Title VII when: (1) during Mr. Muller's investigation into Employee Y's May 2018 complaint, she supported Employee Y's allegations of sex discrimination against Ms. Pusey; reported that Ms. Pusey disfavored and isolated female colleagues, but frequently engaged in flirtatious banter with male colleagues; and confirmed that Ms. Pusey holds women to a different, higher standard; and (2) on October 31, 2018, she told Mr. Bahr that his "cat fight" comment was sexist and demeaning.

201.    Additionally, when, on October 15, 2019, Employee X stated in her written response to her PIP that Ms. Pusey had repeatedly discriminated against her and Plaintiff on the basis of their sex, and retaliated against them for participating in the investigation of Employee Y's complaint, Plaintiff fell within the "zone of interests" that Employee X's protected activity sought to protect.

202.    Ms. Pusey knew that Plaintiff participated in an investigation about her discriminatory conduct because she knew that the investigators interviewed Plaintiff's team (the FGA team), and because management forced her to apologize to Plaintiff and her fellow team members.

203.    Ms. Pusey and Mr. O'Neal retaliated against Plaintiff when, after exhibiting a pattern of recurring retaliatory animus, they placed her on a PIP and constructively discharged her on December 1, 2019. Ms. Pusey and Mr. O'Neail exhibited a similar retaliatory animus against Employee X, by placing her on a PIP and terminating her on October 29, 2019, only two weeks after she last engaged in protected activity on October 15, 2019, and the day after which Lilly falsely told her that it could not substantiate her sex-discrimination and retaliation claims.

204.    Ms. Pusey and Mr. O'Neail placed Plaintiff on a PIP and constructively discharged her despite her outstanding professional records.

205.    Further, Ms. Pusey and Mr. O'Neail retaliated against Mr. Price, who also corroborated Employee Y's allegations of sex discrimination.

206.    Ms. Pusey and Mr. O'Neail's purported reasons for discharging Plaintiff—that she exhibited certain performance deficiencies—are demonstrably false.

207.    Plaintiff's protected activity in reporting the discriminatory and retaliatory conduct of Lilly's management officials caused her constructive discharge.

208.    As a result of Defendant's discriminatory treatment and termination of Plaintiff, Plaintiff has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

## COUNT IV
## RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE § 2-1402.61, AGAINST DEFENDANT ELI LILLY AND COMPANY

209.    Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 208 above, as though restated herein.

210.    The DCHRA prohibits an employer from retaliating against an employee for engaging in protected activity under the Act.

211.    Plaintiff engaged in protected activity under Title VII when: (1) during Mr. Muller's investigation into Employee Y's May 2018 complaint, she supported Employee Y's allegations of sex discrimination against Ms. Pusey; reported that Ms. Pusey disfavored and isolated female colleagues, but frequently engaged in flirtatious banter with male colleagues; and confirmed that Ms. Pusey holds women to a different, higher standard; and (2) on October 31, 2018, she told Mr. Bahr that his "cat fight" comment was sexist and demeaning.

212.    Additionally, when, on October 15, 2019, Employee X stated in her written response to her PIP that Ms. Pusey had repeatedly discriminated against her and Plaintiff on the basis of their sex, and retaliated against them for participating in the investigation of Employee Y's complaint, Plaintiff fell within the "zone of interests" that Employee X's protected activity sought to protect.

213.    Ms. Pusey knew that Plaintiff participated in an investigation about her discriminatory conduct because she knew that the investigators interviewed Plaintiff's team (the FGA team), and because management forced her to apologize to Plaintiff and her fellow team members.

214.    Ms. Pusey and Mr. O'Neal retaliated against Plaintiff when, after exhibiting a pattern of recurring retaliatory animus, they placed her on a PIP and constructively discharged

her on December 1, 2019. Ms. Pusey and Mr. O'Neail exhibited a similar retaliatory animus against Employee X, by placing her on a PIP and terminating her on October 29, 2019, only two weeks after she last engaged in protected activity on October 15, 2019, and the day after which Lilly falsely told her that it could not substantiate her sex-discrimination and retaliation claims.

215.    Ms. Pusey and Mr. O'Neail placed Plaintiff on a PIP and constructively discharged her despite her outstanding professional records.

216.    Further, Ms. Pusey and Mr. O'Neail retaliated against Mr. Price, who also corroborated Employee Y's allegations of sex discrimination.

217.    Ms. Pusey and Mr. O'Neail's purported reasons for discharging Plaintiff—that she exhibited certain performance deficiencies—are demonstrably false.

218.    Plaintiff's protected activity in reporting the discriminatory and retaliatory conduct of Lilly's management officials wholly or partially motivated her constructive discharge.

219.    As a result of Defendant's discriminatory treatment and termination of Plaintiff, Plaintiff has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

**COUNT V**
**SEXUALLY HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2,**
**AGAINST DEFENDANT ELI LILLY AND COMPANY**

220.    Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 219 above, as though restated herein.

221.    Title VII prohibits an employer from subjecting an employee to a hostile work environment because of her gender.

222.    Plaintiff is female.

223.    Plaintiff's first- and second-level supervisors, Mr. O'Neail and Ms. Pusey,

harassed Ms. Elling on the basis of her sex by, *inter alia*, (1) making sexist comments about her, including by calling her "mean," "nasty," "disruptive," "rude," "aggressive," and a "bitch," because she is a strong, assertive female; (2) mocking her physical appearance; (3) attributing her professional success solely to her physical appearance, despite her outstanding credentials and job performance; (4) excluding her from meetings, including the Corporate Affairs Planning Meeting, the quarterly updates to Lilly's CFO, and the briefings for the PhRMA Board meetings, which inhibited her ability to perform her job because she was isolated from communications about Lilly's federal affairs strategies and priorities, for which she was responsible; (5) holding her to higher standards than her male counterparts; (6) undermining her and disparaging her professional reputation both internally and externally, which further inhibited her ability to perform her job; (7) ignoring her presence in the office; (8) fabricating pretextual reasons to place her on a PIP; (8) Mr. O'Neail repeatedly placing his crotch at her eye level and grabbing it in front of her during meetings in her office; and (9) constructively discharging her.

224.    Defendant's harassment of Plaintiff was pervasive, as it continued unabated from May 2017 through Plaintiff's constructive discharge in December 2019.

225.    Defendant's harassment of Plaintiff was severe, because Ms. Pusey repeatedly referred to Plaintiff using sex-based epithets, such as "bitch," and because her discriminatory animus against her resulted in her separation from Lilly.

226.    Defendant's harassment of Plaintiff substantially interfered with her ability to perform her job because, among other reasons, Defendant excluded her from meetings and information that she required to perform her responsibilities, and disparaged her reputation within the lobbying community, which made it difficult for her to fulfill her duties.

227.    Defendant's harassment of Plaintiff caused her severe emotional distress.

228.     As a result of Defendant's sex-based harassment, which culminated with Plaintiff's constructive discharge, the terms and conditions of her employment have been irrevocably and adversely affected.

229.     As a result of the sexually hostile work environment to which Defendant subjected Plaintiff, Plaintiff has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

## COUNT VI
## SEXUALLY HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF THE DISTRICT OF COLUMBIA
## HUMAN RIGHTS ACT, D.C. CODE § 2-1402.11,
## AGAINST DEFENDANT ELI LILLY AND COMPANY

230.     Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 229 above, as though restated herein.

231.     The DCHRA prohibits an employer from subjecting an employee to a hostile work environment because of her gender.

232.     Plaintiff is female.

233.     Plaintiff's first- and second-level supervisors, Mr. O'Neail and Ms. Pusey, harassed Ms. Elling on the basis of her sex by, *inter alia*, (1) making sexist comments about her, including by calling her "mean," "nasty," "disruptive," "rude," "aggressive," and a "bitch," because she is a strong, assertive female; (2) mocking her physical appearance; (3) attributing her professional success solely to her physical appearance, despite her outstanding credentials and job performance; (4) excluding her from meetings, including the Corporate Affairs Planning Meeting, the quarterly updates to Lilly's CFO, and the briefings for the PhRMA Board meetings, which inhibited her ability to perform her job because she was isolated from communications

about Lilly's federal affairs strategies and priorities, for which she was responsible; (5) holding her to higher standards than her male counterparts; (6) undermining her and disparaging her professional reputation both internally and externally, which further inhibited her ability to perform her job; (7) ignoring her presence in the office; (8) fabricating pretextual reasons to place her on a PIP; (8) Mr. O'Neail repeatedly placing his crotch at her eye level and grabbing it in front of her during meetings in her office; and (9) constructively discharging her.

234.    Defendant's harassment of Plaintiff was pervasive, as it continued unabated from May 2017 through Plaintiff's constructive discharge in December 2019.

235.    Defendant's harassment of Plaintiff was severe, because Ms. Pusey repeatedly referred to Plaintiff using sex-based epithets, such as "bitch," and because her discriminatory animus against her resulted in her separation from Lilly.

236.    Defendant's harassment of Plaintiff substantially interfered with her ability to perform her job because, among other reasons, Defendant excluded her from meetings and information that she required to perform her responsibilities, and disparaged her reputation within the lobbying community, which made it difficult for her to fulfill her duties.

237.    Defendant's harassment of Plaintiff caused her severe emotional distress.

238.    As a result of Defendant's sex-based harassment, which culminated with Plaintiff's constructive discharge, the terms and conditions of her employment have been irrevocably and adversely affected.

239.    As a result of the sexually hostile work environment to which Defendant subjected Plaintiff, Plaintiff has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court grant her the following relief:

1.      Award Plaintiff back pay with interest, including compensation for loss of salary, incentives, bonuses, stock options, and other valuable benefits;

2.      Award Plaintiff front pay for the damages she will suffer in the future, including loss of salary, incentives, bonuses, stock options, and other valuable benefits;

3.      Award Plaintiff other compensatory damages against Defendant, including compensation for her reputational, emotional, and other non-economic injuries;

4.      Award Plaintiff the attorneys' fees and the costs she has incurred in bringing this action;

5.      Issue a declaratory judgment that Defendant discriminated against Plaintiff on the basis of her sex, subjected her to a sexually hostile work environment, and retaliated against her for her protected activity, in violation of Title VII and the DCHRA; and

6.      Grant such other relief as this Court deems just and necessary.

Respectfully submitted,

_____
Lynne Bernabei        D.C. Bar No. 938936
Bernabei@BernabeiPLLC.com
Bernabei & Kabat, PLLC
1400 16th Street N.W., Suite 500
Washington, D.C. 20036-2223
tel. (202) 745-1942; fax (202) 745-2627

_____

Devin Wrigley          D.C. Bar No. 1044157
Wrigley@BernabeiPLLC.com
Bernabei & Kabat, PLLC
1400 16th Street N.W., Suite 500
Washington, D.C. 20036-2223
tel. (202) 745-1942; fax (202) 745-2627

*Counsel for Plaintiff*

DATED:  March 26, 2021

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **SONYA ELLING,** | ) | **Complaint for Declaratory and** |
| 8412 Riverside Road | ) | **Equitable Relief and Damages** |
| Alexandria, VA 22308 | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. _____** |
| | ) | |
| **v.** | ) | **Jury Demand** |
| | ) | |
| **ELI LILLY AND COMPANY,** | ) | |
| Lilly Corporate Center, | ) | |
| Indianapolis, IN 46285 | ) | |
| | ) | |
| **Serve:** | ) | |
| National Registered Agents Inc. | ) | |
| 1015 15th Street, N.W. | ) | |
| Suite 1000 | ) | |
| Washington, D.C. 20005 | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


Respectfully submitted,


_____
Lynne Bernabei          D.C. Bar No. 938936
Bernabei@BernabeiPLLC.com
Bernabei & Kabat, PLLC
1400 16th Street N.W., Suite 500
Washington, D.C. 20036-2223
tel. (202) 745-1942; fax (202) 745-2627

_____

Devin Wrigley          D.C. Bar No. 1044157
Wrigley@BernabeiPLLC.com
Bernabei & Kabat, PLLC
1400 16th Street N.W., Suite 500
Washington, D.C. 20036-2223
tel. (202) 745-1942; fax (202) 745-2627

*Counsel for Plaintiff*

DATED:  March 26, 2021